STATE OF NORTH CAROLINA v. GREGORY HUDSON JONES

No. 2

(Filed 10 May 1977)

1. **Criminal Law § 122.2— inability of jury to agree — additional instructions — coercion of verdict**

   Where the trial court knew that some members of the jury had "abnormal conflicts" during the weekend and consequently promised two of the jurors that court would not be held on Saturday and Sunday, the court intimidated the jury and coerced a verdict when he gratuitously called the jury back into court on Friday night, spoke to them of their duty to agree, and threatened to keep them through the weekend unless they reached a verdict.

2. **Criminal Law § 46— evidence of flight**

   An accused's flight is admissible as evidence of consciousness of guilt and thus of guilt itself.

3. **Criminal Law § 46.1— shooting of officer during flight — admissibility**

Testimony by a highway patrolman that defendant shot him numerous times when he stopped defendant for speeding on the morning after the commission of the crimes for which defendant was on trial at a point 110 miles from the crime scene was competent to show flight by defendant even though the testimony disclosed defendant's commission of a separate and distinct offense.

4. **Criminal Law § 46.1— shooting of officer during flight — offer to stipulate flight**

Defendant's offer to stipulate to the fact of flight did not render inadmissible a highway patrolman's testimony that defendant shot him numerous times when he stopped defendant for speeding at a point 110 miles from the crime scene since flight is "relative" proof which must be viewed in its entire context to be of aid to the jury in the resolution of the case.

DEFENDANT appeals from judgments of *Martin (Perry), J.,* 16 February 1976 Session, NEW HANOVER Superior Court.

Defendant was tried upon eight separate bills of indictment, consolidated for purposes of trial, charging him with the commission of the following crimes:

1. First degree murder of Peter Fearing on 16 October 1975. He was convicted on this charge and sentenced to death.

2. Assault with a deadly weapon with intent to kill inflicting serious injuries upon Clyde Melvin Herring on 9 October 1975. He was convicted of assault with a deadly weapon inflicting serious injury and sentenced to eight to ten years in prison to commence at the expiration of sentence pronounced in case No. 3 listed below.

3. Assault with a deadly weapon with intent to kill inflicting serious injuries upon Ronald Elkins on 16 October 1975. He was convicted as charged and sentenced to eighteen to twenty years in prison, to commence at the expiration of sentence pronounced in case No. 5 listed below.

4. Assault with a deadly weapon with intent to kill inflicting serious injuries upon Bryan Jones on 16 October 1975. He was convicted of assault with a deadly weapon inflicting serious injuries and sentenced to eight to ten years in prison, to commence at the expiration of sentence in case No. 2 listed above.

5. Aggravated kidnapping of Ronald Elkins on 9 October 1975 for the purpose of facilitating the commission of the felonies of assault with a deadly weapon inflicting serious injury, burglary and murder. He was convicted of kidnapping and sentenced to twenty years in prison, to commence at the expiration of sentence pronounced in case No. 6 listed below.

6. First degree burglary of the dwelling house of Mrs. Donna Rowe (mother of Peter Fearing) with intent to commit murder therein on 16 October 1975. He was convicted of first degree burglary and sentenced to life imprisonment to commence at the expiration of the death sentence imposed in case No. 1 listed above.

7. Felonious breaking and entering of the residence of Melvin and Diane Herring with the intent to commit larceny therein. He was convicted of nonfelonious breaking or entering and nonfelonious larceny and sentenced to two years in prison to commence at the expiration of the sentence pronounced in case No. 8 listed below.

8. Felonious breaking and entering of a motor vehicle (1966 Oldsmobile owned by Donna Davis Rowe which contained the goods and valuables of Peter Fearing valued at $140) with the intent to commit larceny therein. He was convicted of breaking or entering a motor vehicle and sentenced to not less than four nor more than five years to commence at the expiration of the sentence pronounced in case No. 4 listed above.

The State offered evidence tending to show that on 8 October 1975 at about 10 p.m. Ronald Elkins, age seventeen, and Peter Fearing, age nineteen, were hitchhiking and defendant picked them up in his light blue Volkswagen. He said he had some pot he wanted them to sell for him and took them to his house in Wilmington where all three of them smoked a joint of marijuana. Defendant talked at length to Peter Fearing and then took the two boys home. The following day Butch Herring, Elkins and Fearing rode to Wrightsville Beach in Herring's Plymouth. Herring stayed in his car while Elkins and Fearing went onto the beach to look for defendant. Very soon defendant came out of the water and took off his diving equipment which all of them carried to his Volkswagen parked near Butch Her-

ring's car. Defendant told Elkins "he hoped nobody was trying to rip him off or he would collect a little bit of interest."

Later Elkins and Herring went to another section of the beach where they waited for defendant and Peter Fearing to arrive in defendant's car. When defendant arrived he took a metal box out of his Volkswagen and he and Fearing walked up the beach where they joined the other two. All four of them smoked a joint of marijuana which defendant took from the metal box. In due course they all smoked a second and a third joint at defendant's invitation. After it became dark on the beach, defendant noticed his "bag of pot" was missing and inquired as to its whereabouts. Then Butch Herring said, "Look out, Peter. He's got a gun," and ran away. Peter Fearing ran up the dunes with the box that contained the marijuana but, when defendant pointed the gun at him, dropped the box and ran away. Defendant pointed his gun at Elkins, cursed him, picked up the metal box, returned to his Volkswagen and left.

A short while later defendant, in his Volkswagen, accosted Elkins walking across the bridge at Wrightsville Beach, drew his gun, and ordered Elkins to get in the Volkswagen. He drove to where Butch Herring's car was parked and forced Elkins to take a jack and some tapes out of Herring's car and place them in defendant's Volkswagen. Defendant then drove to Peter Fearing's residence, parked three houses away, and forced Elkins to get a tape player, some headphones, a speaker and a couple of tapes out of Peter Fearing's car, and a Coleman stove out of the garage, and put them in defendant's Volkswagen. In the same fashion Elkins was forced to get some tires and place them in defendant's vehicle. Defendant then drove to Elkins' home at 1102 Browning Drive. After inspecting the Elkins premises for things he might want to steal, defendant told Elkins to take him to Butch Herring's house on Barnett Avenue, which he did. They went inside and nobody was home. Defendant forced Elkins to get the stereo and tapes, a coffee table, a bar and bar chairs, a black light bulb, and other articles which were loaded into defendant's vehicle. Then defendant drove to a spot on Market Street where he told Elkins to get out and consider himself lucky; that he and Peter Fearing had better get out of town because the next time he saw them he was going to kill them. Elkins hitchhiked a ride home, arriving about 5 a.m. on 7 October 1975.

Later on the same morning Elkins went to Peter Fearing's home and called the police. He and Fearing talked to the police and told them what had happened the previous night.

On 16 October 1975 Elkins went to Peter Fearing's house at 1537 Fielding Drive where he spent most of the day. That night they went out to obtain drinks at a 7-11 store and returned about 11:30 p.m. When they walked in the house they heard a noise "like something fell" and turned off the lights. Shortly thereafter Bryan Jones, age sixteen, arrived and the three of them smoked marijuana. Ten minutes later Elkins was shot in the back. As Elkins turned, he saw defendant in the hallway with a gun pointed at him. No one knew defendant was in the house until that time. Elkins had not seen him since 10 October. Elkins then heard more shots in rapid succession. Defendant then shot Elkins in the head. After awhile Elkins arose and saw Peter Fearing lying between the sofa and the book shelf. Defendant was gone. Elkins stumbled to the house next door where he told what had happened. The rescue squad arrived and took Elkins to the hospital where he spent seventeen days.

The rescue squad also entered the house to pick up Peter Fearing who died later at the hospital.

The State's evidence further tends to show that after defendant shot Peter Fearing and Ronald Elkins, Bryan Jones, who was seated in a chair, started to get up and defendant shot him in the leg. Jones fell and defendant walked toward him, pointed the gun at Jones' head and pulled the trigger. The gun clicked but was out of ammunition. Defendant grabbed the gun "toward the bottom where the clip is and then ran away." Jones was then able to escape.

Harry Stegall, a member of the State Highway Patrol, testified that on 17 October 1975 at approximately 8:15 a.m. he first saw defendant traveling west on U. S. 74 in an orange and red Volkswagen station wagon. At that time defendant was 110 miles from Wilmington, N. C. and moving at 65 miles per hour in a 55-mile zone. Trooper Stegall pursued the Volkswagen approximately one mile in a marked patrol car and finally succeeded in stopping the vehicle. Defendant remained in the Volkswagen and Trooper Stegall approached the driver's side and observed that defendant was the only occupant of the vehicle. He asked defendant for his operator's license. After

examining the license he advised defendant that he had been clocked at 65 miles per hour in a 55-mile zone and it would be necessary for defendant to follow the officer to Laurinburg to post bond. Defendant said nothing. As Trooper Stegall turned toward the rear of the Volkswagen to return to his patrol car, defendant said "Hey," raised a .380 automatic pistol and fired five shots into the officer's body. One bullet entered directly over the heart; one pierced a lung; one hit the collarbone and went across the officer's chest, severing the brachial plate in the shoulder and paralyzing the right arm; and one bullet entered the neck and lodged in the jaw. As Trooper Stegall fell, defendant shot him in the side of the face. While the officer lay on the ground, defendant got out of the Volkswagen, ran toward the officer in a low crouched position and fired two more shots—one in the shoulder and the other in the leg. He then took Trooper Stegall's gun, reentered the Volkswagen and drove away. The officer's weapon was recovered when defendant was captured the next day.

Defendant testified in his own behalf. He said he was twenty-six years of age and had spent two years in the Army. He was born in Virginia, went to high school and college in New Jersey, and came to Wilmington to go to school at the Cape Fear Technical Institute in the fall of 1975. He met Peter Fearing and Ronnie Elkins on the day he picked them up. They offered him marijuana cigarettes which all of them smoked, and he invited them to his house where they listened to music. Afterwards, defendant took them home.

A day or two later Peter Fearing told defendant he was a scuba diver and expressed the wish that they dive together. On 9 October defendant went scuba diving at Wrightsville Beach and when he came out of the water it was dark. He met Peter Fearing and Ronnie Elkins near the jetty and they helped him carry some of his gear to his Volkswagen. On the way they passed a green Dodge in which Butch Clyde Herring, whom defendant had never met, was seated. While defendant changed his clothing, Peter Fearing left to talk to Butch Herring. Soon Peter Fearing returned and said, "We will meet you. You know we want you to meet Butch. We will meet you at the Surf Club." With Peter Fearing giving directions they went north up the beach to a building with no lights in it which Peter Fearing said was the Surf Club. Defendant became nervous and slipped his pistol into his pants pocket. Defendant and Peter Fearing then

walked down to the dunes on the berm of the beach where they joined Ronnie Elkins and Butch Herring. There they smoked pot, moved further down the beach and smoked another marijuana cigarette. All of a sudden Butch pulled defendant's body completely off the ground with a tire tool wrapped around defendant's throat. Peter Fearing held defendant's feet while his house keys and car keys were taken from his belt loop. Peter got the metal box and Elkins got the diver's light. Defendant grabbed his gun from his back pocket and shot Butch Herring, firing it over his shoulder. Butch Herring dropped the tire tool and ran down the beach. Peter Fearing released defendant's feet and started running toward the dunes with the metal box and defendant's keys. Defendant pointed the pistol at Fearing who dropped everything and kept running. Ronald Elkins tried to run but fell on his face. As defendant reclaimed his light, he told Elkins, "I ought to shoot you."

Defendant gathered his things together, drove home and attended classes the following day. On returning home he found his television and couch were missing, and things were all over the floor in the dining room and living room. While delivering an item to his next door neighbor, he noticed the police at his door, and, thinking perhaps Butch Herring had died from his "over-the-shoulder" shot, he hid under the house until they left. He then hitchhiked to Carolina Beach and from there to Atlanta to visit friends. He then returned to Wilmington to find out why the police were after him and to get $600 he had in his Wilmington bank account.

When he got to his house in Wilmington about everything was gone—the stereo, desk, school books, scuba gear, even the rugs in the bedroom. He drove to Carolina Beach where he stayed for several days and then, about midnight on 15 October, he returned to Wilmington to see Peter Fearing. When he got to Peter's house he entered the garage but failed to see any of his furniture or his stereo. He heard voices inside, knocked, and Bryan Jones opened the door. He saw Peter Fearing standing at the end of the couch and just walked past Jones into the living room. He asked Peter what he had done with defendant's furniture. Ronald Elkins was in a chair near the stereo. Defendant had a .380 automatic in his pants pocket. While arguing with Peter Fearing, defendant was kicked in the back and fell to the floor. Peter then hit defendant in the face and Elkins ran over with a heavy ceramic object and hit defendant about

the ear and side of the head with it. Then Peter Fearing, Ronald Elkins and Bryan Jones all started pounding and kicking defendant until he became semiconscious and his vision was blurred. Peter Fearing was behind defendant with a big knife—like a hunting knife—in his hand. Defendant shoved him over the coffee table towards the door and saw Elkins coming at him again. At that point defendant took the pistol from his pocket and fired two rounds in Peter's direction. Ronald Elkins grabbed the gun and every time he pulled on it the gun would fire. It went off three or four times, bullets striking the coffee table twice. Bryan Jones had his right arm around defendant's throat and defendant shot at him. Jones fell, then got up and went out the door. Defendant went up the hall and reloaded his pistol. He then fired again at Elkins who was "reaching for something." Finally, defendant left the house through a window and rode his motorcycle back to Carolina Beach.

Defendant started hitchhiking toward Atlanta. The third ride he caught was in a red Volkswagen and the driver requested defendant to drive. While driving down the highway he ran the radar trap that Trooper Harry Stegall testified about. Defendant, scared because he had heard on the radio that he was wanted for murder, panicked when Trooper Stegall pulled him over. He thought the officer was arresting him for murder. He didn't intend to kill Trooper Stegall but only intended to disarm him. After shooting Trooper Stegall, defendant drove a mile or two and abandoned the vehicle—just got out of the red Volkswagen, leaving his baggage in it, and started walking through the woods. He was apprehended a day or two later and taken back to Wilmington.

Sentence of death for the first degree murder of Peter Fearing was pronounced at the conclusion of the trial on 20 February 1976. Prayer for judgment was continued in all other cases until 4 October 1976. At that time the district attorney prayed judgment and judgments were pronounced as above set out.

Defendant appealed the sentences of death and life imprisonment to the Supreme Court as of right pursuant to G.S. 7A-27(a). We allowed motion to bypass the Court of Appeals on all remaining convictions to the end that all matters pertaining to this trial be initially reviewed by the Supreme Court.

*Rufus L. Edmisten, Attorney General; James E. Magner, Jr., Assistant Attorney General, for the State of North Carolina.*

*George H. Sperry, attorney for defendant appellant.*

HUSKINS, Justice.

It has long been held in this State that "[e]very person charged with crime has an absolute right to a fair trial. By this it is meant that he is entitled to a trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm." *State v. Carter,* 233 N.C. 581, 65 S.E. 2d 9 (1951); *accord, State v. Belk,* 268 N.C. 320, 150 S.E. 2d 481 (1966); *State v. Canipe,* 240 N.C. 60, 81 S.E. 2d 173 (1954). Responsibility for enforcing this right necessarily rests upon the trial judge. *State v. Manning,* 251 N.C. 1, 110 S.E. 2d 474 (1959). He must conduct himself with the "utmost caution in order that the right of the accused to a fair trial may not be nullified by any act of his." *State v. Carter, supra.* "He should at all times be on the alert, lest, in an unguarded moment, something be incautiously said or done to shake the wavering balance which, as a minister of justice, he is supposed, figuratively speaking, to hold in his hands." *Withers v. Lane,* 144 N.C. 184, 56 S.E. 855 (1907).

In this regard we said in *State v. McVay,* 279 N.C. 428, 183 S.E. 2d 652 (1971), quoting 3 Strong, N. C. Index 2d, Criminal Law § 122, that:

> "Generally, where the jury have retired but are unable to reach a verdict, the court may call the jury back and instruct them as to their duty to make a diligent effort to arrive at a verdict, so long as the court's language in no way tends to coerce or in any way intimate any opinion of the court as to what the verdict should be."

Under certain circumstances language which informs the jurors that they may be kept for a specified period of time unless they reach a verdict may amount to coercion, tainting the verdict. *Pfeiffer v. State,* 35 Ariz. 321, 278 P. 63 (1929); *Canterbury v. Commonwealth,* 222 Ky. 510, 1 S.W. 2d 976 (1928). It was said long ago in *Green v. Teflair,* 11 How. Pr. (N.Y.) 260 (1853), that "[a]n attempt to influence the jury, by referring to the time they are to be kept together, or the inconvenience to which they are to be subjected, in case they are so

pertinacious as to adhere to their individual opinions, and thus continue to disagree, cannot be justified."

Nevertheless, whether prejudicial error arises from additional instructions urging the jury to agree on a verdict is largely dependent on the facts and circumstances of each case. *State v. McKissick*, 268 N.C. 411, 150 S.E. 2d 767 (1966). In *State v. McVay, supra,* the trial judge instructed as follows:

> "COURT: Members of the jury, you may reconcile any differences you have under the evidence and render a verdict. The Court will express the hope that you will do so. If this jury fails to render a verdict, it would then become necessary to call upon another jury to pass upon the cases. I have no reason to believe that another would have more intelligence and be better qualified than this jury to make the decisions. Even so, the Court would have the jury bear in mind that each person is a keeper of his own conscience and the Court would not have a juror to do violence to his own conscience nor to render verdict. *However, we have until Friday night for you to work on this case and no reason to hurry the matter.* So take your time and deliberate further, please. Please retire." (Emphasis added.)

The statement was given in response to the inquiry of the jury foreman that, "we have reached an impasse. Shall we continue?" This Court held that in the context of that case "[t]he additional statement that the jury had until Friday to work on the case was given simply to assure the jury that they need not rush their deliberations and that they had ample time in which to consider their verdict." *State v. McVay, supra; accord, People v. Haacke,* 34 Cal. App. 516, 168 P. 382 (1917) ; *State v. Gresham,* 290 N.C. 761, 228 S.E. 2d 244 (1976) ; *State v. McKissick, supra; Butler v. State,* 185 Tenn. 686, 207 S.W. 2d 584 (1948). We now apply these principles to the facts of our case.

During the State's rebuttal testimony the following transpired:

> "COURT: Well, while you gentlemen are apparently thinking, let me inquire of the jurors who were empaneled Tuesday what, if anything, I said to you about sessions beyond today. I do recall telling the jurors, or at least two of them, upon their inquiry that we would not have court on Saturday or Sunday. Do you recall if I made any statement to you about Friday evening, meaning after 6:00 p.m.

State v. Jones

MR. GORE (Juror): Could I say something, sir?

COURT: If it is about what I am talking about, yes, sir.

MR. GORE: I was going to say that my preference would be to continue tonight instead of having to come back Monday. I mean, that's my preference.

COURT: Juror No. 2, I think I promised you we would not have court tomorrow, is that right?

MRS. BROCK (Juror No. 2): Yes, sir, and Sunday.

COURT: How about tonight? Did I promise you anything about tonight?

MRS. BROCK (Juror No. 2): No, that was because I have conflicts on Saturday and Sunday and I still do have the same conflicts.

COURT: You explained that before you were selected. I understand that, but you do not have any tonight except for the normal conflicts that most people have?

MRS. BROCK: Mine are really abnormal, sir."

Immediately prior to the charge to the jury Judge Martin entered the following order:

"COURT: It is now apparent to the court that this trial cannot be concluded during its regular hours assigned by law for this session of court which expires at 5:00 p.m. on this day. Therefore pursuant to the authority vested in me as presiding judge under G.S. 15-167 I extend this court by virtue of the fact that the trial of a felony is in progress on the last Friday of this session of court and it appears to my satisfaction that it is unlikely that such trial can be completed before 5:00 p.m. Therefore, as the presiding judge, I extend this session of court as it shall be necessary for the purpose of the completion of this court to be completed today, tonight or tomorrow.

This the 20th day of February, 1976. 4:20 p.m."

The charge was completed and the jury sent to deliberate at a few minutes past six o'clock on that Friday. The jury returned of its own volition twice: once to view an exhibit and once to ask that the instructions regarding self-defense be

repeated. At 9:20 the court called the jury back, inquired as to its progress and then made the following statement:

"Ladies and Gentlemen of the Jury, I realize this has been a long trial and I am not making any effort to rush you, particularly at this time, because we do not have to rush. I can very easily make arrangements for you to spend the night here, which I shall start doing immediately; not here but in quarters that will be provided for you in a convenient lodging area in the City of Wilmington and we can come back tomorrow; and if we don't finish tomorrow we can come back Sunday. Please understand that I am not trying to rush you, but since you say, Mr. Foreman, that you are making progress very slowly I would remind you Ladies and Gentlemen of the Jury what a disagreement means, and remind you again of what I told you in one of the final parts of my charge—that a jury is composed of twelve individuals and you are a deliberative body. It is not usually wise for a juror to take an adamant position at the commencement of deliberations from which they say they will not recede under any circumstances. That's the reason that you have twelve jurors rather than one for to take such an adamant position at the commencement of deliberations may possibly cause you embarrassment further on in the deliberations if you find that your original position was erroneous; so I presume that you Ladies and Gentlemen of the Jury realize what a disagreement would mean, that is, unable to reach a verdict. It means, of course, that there will be another week of Court when the time of the Court will have to be consumed in the trial of these actions again by another jury. You have heard all of the evidence in this case and the charge of the Court as to the law, which appears to be reasonably easy to understand."

[1] It is our view that, in the context of this case, this language amounts to improper pressure upon the jury to arrive at a verdict. Judge Martin knew that some members of the jury had "abnormal conflicts" and consequently had promised two of the jurors that court would not be held on Saturday or Sunday. When he gratuitously called the jury back into court, spoke to them of their duty to agree and threatened to keep them through the weekend unless they reached a verdict, his actions could have no other effect than to intimidate and to coerce the jury to reach a verdict.

Viewed in its totality, we find that the language embodied in the additional instructions to the jury was coercive and intimidating so as to deprive the jurors of "that freedom of thought and of action so very essential to a calm, fair and impartial consideration of the case." *State v. Windley,* 178 N.C. 670, 100 S.E. 116 (1919). Defendant must therefore be given a new trial. *State v. Roberts,* 270 N.C. 449, 154 S.E. 2d 536 (1967).

While these utterances alone compel us to grant a new trial, they do not comprise the totality of Judge Martin's role in the deliberations of the jury. Close examination of the record reveals numerous remarks by him in the presence of the jury during the course of the trial, the cumulative effect of which suggests judicial leaning. Whether, by making these remarks, the judge intended to express an opinion is not controlling; rather, the prejudicial effect of judicial utterances flows from the probable meaning attached to them by the jury. *State v. McEachern,* 283 N.C. 57, 194 S.E. 2d 787 (1973).

In view of this disposition of defendant's appeal we find it necessary to pass on only one other assignment of error, to wit: the admission into evidence of the testimony of Trooper Harry Stegall.

Defendant contends the testimony of Trooper Stegall should have been excluded in that, by putting before the jury evidence of the defendant's assault on Trooper Stegall, it showed defendant had committed a separate, distinct offense in contravention of the rule discussed in *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954). Not so. We hold the testimony was properly admitted.

[2, 3] The testimony of Trooper Stegall established salient facts concerning the *flight* of the defendant. An accused's flight is "universally conceded" to be admissible as evidence of consciousness of guilt and thus of guilt itself. Wigmore on Evidence § 276 (1940). In North Carolina it has long been held that "[s]ubsequent acts, including flight . . . are competent on the question of guilt. [Citations omitted.] The basis of this rule is that a guilty conscience influences conduct." *State v. Steele,* 190 N.C. 506, 130 S.E. 308 (1925); *accord, State v. Irick,* 291 N.C. 480, 231 S.E. 2d 833 (1977); *State v. Lampkins,* 283 N.C. 520, 196 S.E. 2d 697 (1973); *State v. Godwin,* 216 N.C. 49, 3

S.E. 2d 347 (1939) ; *State v. Tate,* 161 N.C. 280, 76 S.E. 713 (1912) ; *State v. Nat,* 51 N.C. 114 (1858).

Even though the evidence of flight may disclose the commission of a separate crime by defendant, it is nonetheless admissible. *State v. White,* 101 Ariz. 164, 416 P. 2d 597 (1966) ; *State v. Nelson,* 261 La. 153, 259 So. 2d 46 (1972) ; *State v. Ross,* 92 Ohio App. 29, 108 N.E. 2d 77 (1952) ; *Broyles v. State,* 83 Okl. Crim. 83, 173 P. 2d 235 (1946), *cert. denied,* 329 U.S. 790 (1946).

Thus in *State v. Irick, supra,* we held that where immediately following a burglary the defendant attempted to elude police and fired shots at them, such evidence of flight was evidence of guilt and therefore admissible. *See, e.g., Fulford v. State,* 221 Ga. 257, 144 S.E. 2d 370 (1965) (defendant apprehended pursuant to arrest warrant for a separate crime) ; *People v. Anderson,* 17 Ill. 2d 422, 161 N.E. 2d 835 (1959) (defendant resisted arrest and shot officer) ; *People v. Gambino,* 12 Ill. 2d 29, 145 N.E. 2d 42 (1957), *cert. denied,* 356 U.S. 904 (1958) (car stolen in armed escape) ; *Meredith v. State,* 247 Ind. 233, 214 N.E. 2d 385 (1966) (defendant killed police officer during flight) ; *State v. Nelson, supra* (theft of automobile to facilitate flight) ; *State v. Neal,* 231 La. 1048, 93 So. 2d 554 (1957) (defendant jumped bail) ; *State v. Ball,* 339 S.W. 2d 783 (Mo. 1960) (defendant assaulted police officer and resisted arrest) ; *State v. Matheson,* 225 N.C. 109, 33 S.E. 2d 590 (1945) (threats and statements made to taxi driver when cab commandeered to aid defendant's escape) ; *State v. Payne,* 213 N.C. 719, 197 S.E. 573 (1938) (defendant evaded arrest and shot at officers during flight) ; *State v. Ross, supra* (burglaries and larcenies to facilitate flight) ; *Broyles v. State, supra* (policeman shot during flight) ; *Johnson v. State,* 156 Tex. Crim. 534, 244 S.W. 2d 235 (1951) (defendant shot at police officer during flight). Applying these rules we hold the testimony of Trooper Stegall describing defendant's flight competent and admissible.

[4] Nevertheless, defendant contends that by virtue of his offer to stipulate to his identity, to his flight and to the weapon used in the murder for which he is now on trial, there is no real issue on these facts. He argues that the probative value of evidence concerning the shooting of Trooper Stegall is greatly outweighed by the prejudice to the defendant of the evidence of

the shooting and thus should not be admitted. Whatever the merits, if any, of this position with regard to identity of the defendant and the weapon, this argument clearly has no merit with respect to the flight of defendant. *See State v. Payne, supra.* Flight is not an element of homicide, the presence of which must be answered by a yes or no; rather, as we have noted, it is "evidence of consciousness of guilt and thus of guilt itself." It is only a circumstance bearing on defendant's guilt. *State v. Caddell,* 287 N.C. 266, 215 S.E. 2d 348 (1975); *State v. Gaines,* 260 N.C. 228, 132 S.E. 2d 485 (1963). It is open to explanation and rebuttal by the defendant. 2 Stansbury's North Carolina Evidence (Brandis rev. 1973) § 178 and cases cited. Thus the degree or nature of the flight is of great importance to the jury in weighing its probative force. *See State v. Hairston,* 182 N.C. 851, 109 S.E. 45 (1921); *State v. Malonee,* 154 N.C. 200, 69 S.E. 786 (1910). For example, it is likely that a jury would attach a different significance where a defendant fled a short distance to a friend's house following the alleged commission of a crime than where, as here, the defendant attempted to flee the state and in doing so assaulted a law enforcement officer. Flight is "relative" proof which must be viewed in its entire context to be of aid to the jury in the resolution of the case. Stipulation to the *fact of flight* is not sufficient under these circumstances. The testimony of Trooper Stegall was properly admitted.

For the reasons stated there must be a new trial in each of the eight cases. It is so ordered.

New trial.