STATE OF NORTH CAROLINA v. KAREEM VASHEAN LOCKE

No. 145A92

(Filed 18 December 1992)

1. **Evidence and Witnesses § 2783 (NCI4th) — improper impeachment questions — objections sustained — curative instruction — error cured**

   In a prosecution for first degree murder, the trial court's prompt sustention of defendant's objections to questions asked by the prosecutor during cross-examination of defendant concerning his purported expulsion from high school and the court's curative instruction to "disregard" were sufficient to cure any prejudice from the allegedly improper questions. There is no reasonable possibility that the jury's verdict would have been different had the prosecutor not implied that defendant had been expelled from school where the State presented two eyewitnesses to the circumstances of the shooting of the victim, and defendant did not challenge directly the main eyewitness's identification of him as the perpetrator.

   **Am Jur 2d, Homicide §§ 536, 540; Witnesses §§ 814-815.**

2. **Evidence and Witnesses § 728 (NCI4th) — character evidence — purchase of firearms — questions not prejudicial**

   Assuming, without deciding, that it was error for the trial court in a first degree murder prosecution to overrule defendant's objection to the prosecutor's question implying that defendant might have been involved in the purchase of guns, there is no reasonable possibility that this information affected the jury's verdict where defendant himself had earlier volunteered information that he knew his father intended to seek and buy a gun when they previously went together to the street where the murder occurred, and it was unlikely that the exposure of the jury to this tangential information changed the outcome of the trial given the properly admitted

evidence of defendant's guilt, including eyewitness testimony identifying him as the perpetrator.

**Am Jur 2d, Witnesses §§ 814-816.**

3. **Evidence and Witnesses § 1694 (NCI4th)— photographs of victim's body — admissibility**

The trial court in a first degree murder prosecution did not err in the admission of seven photographs of the victim's body for illustrative purposes where the victim's brother used one photograph to illustrate the location and condition in which he found his brother's body; a police crime technician used three photographs to illustrate his testimony about the condition of the victim and his wounds on the night of the shooting; the examining pathologist used three autopsy photographs of the victim's body to explain his testimony about the victim's wounds and the cause of death; and the photographs, which show that the victim was shot while his back was turned, support the elements of premeditation and deliberation.

**Am Jur 2d, Evidence §§ 785-787.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Saunders, J., at the 30 September 1991 Criminal Session of Superior Court, Mecklenburg County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 2 November 1992.

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the State.*

*Isabel Scott Day, Public Defender, by Robert L. Ward, Assistant Public Defender, for defendant appellant.*

WHICHARD, Justice.

Defendant was convicted of the first-degree murder of Jeffrey Tate. Tate was shot outside his home on the evening of 4 November 1990. The State presented the testimony of two neighbors of the victim who witnessed events of the fatal shooting and its immediate

aftermath. Defendant presented an alibi defense and offered evidence tending to impeach the credibility of the key neighbor-witnesses.

On appeal, defendant contends that the two key issues at trial were identity of the perpetrator and credibility of the witnesses, including himself. In this context, defendant contends that he was unduly prejudiced by questions on the part of the prosecutor containing irrelevant and prejudicial information and by inflammatory and prejudicial photographs of the deceased. We disagree.

The main witness against defendant was William Norman. Norman had seen defendant prior to the night of the shooting driving a black car in the area of Norman's residence. Norman lived in a duplex apartment located at 1516 Cummings Avenue, Charlotte, North Carolina. The victim, whom Norman had known for four years, lived about 245 feet away at 1721 Newland Road with his mother. Between the hours of 10:00 and 11:00 p.m. on the evening of the shooting, Norman, who had been watching television, went out and stood on the front porch of his apartment. Norman saw Tate standing on the sidewalk near a streetlight in front of the house at 1510 Cummings Avenue. Tate was talking to defendant and two other young black men. The group was ten to fifteen feet from Norman.

Norman saw defendant swing at Tate, who ducked and ran. Defendant opened his coat, pulled out a gun and started shooting at the running Tate. Three or four shots were fired at Tate, who fell, got up, and ran behind the house. Norman then saw the three young men get into a black Trans-Am or Camaro car with a gold stripe that was parked in the driveway at 1510 Cummings Avenue. Defendant was the driver; he backed the car into the street and drove away.

The State also presented testimony from Chester Lowery, a resident of 1510 Cummings Avenue, whose sister was married to Tate's brother. Tate had visited Lowery at 1510 Cummings Avenue around 4:45 p.m. on the day of his death. Around 6:00 p.m., Lowery saw Tate again, getting out of a black Camaro driven by defendant and containing two other male passengers. When Lowery heard the shots fired by defendant that night, Lowery came outside his house and saw the same black Camaro, with gold trim, mag wheels, and a "T" shaped spinner, backing out of his yard and driving off in a reckless manner.

STATE v. LOCKE

[333 N.C. 118 (1992)]

The victim's brother, Reginald Jerome Tate, was visiting friends in the 1600 block of Cummings Avenue at the time of the shooting and heard the shots. When he returned home about twenty-five minutes later, he discovered the body of his brother lying in the driveway of his mother's house. Authorities were then alerted.

The officer who responded first interviewed Lowery, who gave a description of the car. Lowery told the officer that Norman had witnessed the shooting. When the officer interviewed Norman, Norman described the shooting but made no identification of the perpetrator. The officer interviewed Norman again on the evening of 15 November and the morning of 16 November. On that morning, Norman selected defendant's photograph from a photographic array and identified him as the perpetrator.

Defendant presented an alibi defense through his and his older brother Robert's testimony. Robert testified he was at home on the evening of 4 November 1990 when defendant, then sixteen years old, came in around 10:00 p.m. and stayed until after midnight. Robert further testified that his father went out sometime that evening in the Camaro. Although several other members of the family were present, according to Robert, no other family member testified in support of defendant's alibi defense.

Besides presenting an alibi defense, defendant also sought to undermine the credibility of the State's witnesses, particularly that of Norman. Norman testified that he was known, among other things, as "Weasel." Norman admitted that after witnessing the shooting, his only action was to go back into his house and continue watching television. He did not call the police. Defendant presented evidence that sometime after the shooting, Norman lost his job, was worried about being able to afford Christmas presents, and had contact with Crimestoppers. Norman admitted talking to Crimestoppers, but denied receiving any reward from that organization or any other.

Defendant also presented evidence that Norman reluctantly talked with the investigating officer on the night of the shooting, "pushed" her out of the house after giving a statement, and explained he did not want to be seen talking to the police. When the officer returned on 15 and 16 November, Norman again repeated that he did not want the neighbors to see him talking to the police.

On appeal, defendant also contends he impeached the credibility of Lowery. Defendant contends that in a pretrial statement to two officers, Lowery described the driver of the black car as a middle-aged, gray-haired man. This description does not meet that of defendant, who was a teenager in 1990. At the trial, defense counsel went through the statement line-by-line and asked Lowery if he remembered making the particular points. Our review of the transcript reveals that Lowery testified as follows:

> Q. And, "You then ran outside and saw a black Camaro Z-28 leaving the scene in a rapid manner." Do you remember telling Officer Hervey and Officer Carpenter that?
>
> A. Uh-huh (yes).
>
> . . . .
>
> Q. And it says, "The reporting person was unable to see who was driving the car at this time, but he had seen the car parked at the dead end of Kenshaw numerous times." Do you remember telling Officer Hervey and Officer Carpenter that?
>
> . . . .
>
> A. Uh-huh (yes).
>
> Q. Then it says, "The driver *then* was a black male approximately forty-five to fifty years old with a gray and black mustache." Do you remember telling them that?
>
> A. Uh-huh (yes).

(Emphasis added).

From our reading of the transcript it appears that Lowery was not referring to a person he saw driving the car on the night of the shooting when he described a middle-aged man; rather, he was referring to a man whom he had seen driving the car on other occasions. We believe this reading is correct, given that just lines before the statement about the middle-aged driver, Lowery had told the officers he did not see who was driving the car on the night of the shooting. Later, defense counsel drove this point home when she had Lowery confirm that there was nothing in his pretrial statement about seeing anyone behind the wheel of the car on the night of the shooting.

STATE v. LOCKE

[333 N.C. 118 (1992)]

[1]   In his first assignment of error, defendant contends the trial court erred by failing to strike testimony and issue curative instructions to the jury following inflammatory and irrelevant questions by the State involving defendant's purported expulsion from school and his purported multiple purchase of guns. The first matter under this assignment involves the following exchange between defendant and the prosecutor:

Q. Now—but when you were in school, you got kicked out of school?

Ms. Weigand: Objection.

Court: Sustained.

Q. Well, have you ever been expelled from school?

Ms. Weigand: Objection. I want to be heard outside the presence of the jury, Your Honor.

Court: Disregard, members of the jury.

Defendant contends the trial court did not properly cure the prejudice of the State's insinuation that defendant was a "bad boy" merely by telling the jury to "disregard." The trial court did not make clear what the jury was to "disregard"—the prosecutor's questions or defense counsel's objections and request to speak outside the presence of the jury.

In its response, the State notes the above exchange occurred on cross-examination after defendant had testified on direct that he attended school and was scheduled to enroll in Harding High School that day. The State contends that having implied on direct that he was a student in good standing, defendant was subject to impeachment showing his school record was otherwise. The State further argues that defendant fails to show prejudice; the prosecutor asked only two questions and the trial court promptly sustained defense counsel's objections and issued a curative instruction.

It is not necessary to determine whether the above questions constituted improper impeachment if the trial court acted promptly to cure any prejudice. We believe it is clear from the context of the exchange, including the fact that the prosecutor immediately pursued a different line of questioning after the trial court issued its instructions, that the jury would have understood that the instruction to "disregard" referred to the prosecutor's implication

that defendant had been expelled from school. We hold that the trial court's prompt actions of sustaining the objections and issuing a curative instruction were sufficient to cure any prejudice. This Court has held consistently that such actions cure any prejudice due to a jury's exposure to incompetent evidence from a witness. *See, e.g., State v. Hill*, 331 N.C. 387, 406, 417 S.E.2d 765, 773-74 (1992). In fact, as the State notes, no incompetent evidence was admitted which the trial court then had to strike; rather, defendant's argument appears to be that the mere questions posed by the prosecutor were prejudicial. The Court applies the same rule when faced with this situation. *Cf. State v. McLean*, 294 N.C. 623, 634-35, 242 S.E.2d 814, 821 (1978) (trial court did not abuse its discretion in denying defendant's motion for mistrial where trial court sustained defendant's objections to a question by the prosecutor containing improper information and instructed the jury to disregard the question).

We are confident defendant was not prejudiced by the implication that he might have been expelled from school. In another first-degree murder case, three different witnesses referred to a defendant's arrest record. *State v. Wilson*, 311 N.C. 117, 316 S.E.2d 46 (1984). One witness testified he had seen the defendant "two days after he got out of prison." A second witness testified she and the defendant "went to pawn some of the stuff [the defendant] had stolen." A third witness testified the defendant had told her he had been charged with three burglaries. The trial court sustained defense counsel's objections and admonished the jury not to consider the evidence. We held that any prejudicial effect from the incompetent evidence was cured by the trial court's actions. *Wilson*, 311 N.C. at 128, 316 S.E.2d at 53.

In doing so, we discussed at length the reasoning in *State v. Aycoth*, 270 N.C. 270, 154 S.E.2d 59 (1967). *Wilson*, 311 N.C. at 127, 316 S.E.2d at 53. In *Aycoth*, the Court stated that " '[i]n appraising the effect of incompetent evidence once admitted and afterwards withdrawn, the Court will look to the nature of the evidence and its probable influence upon the minds of the jury in reaching a verdict.' " *Aycoth*, 270 N.C. at 272, 154 S.E.2d at 60 (quoting *State v. Strickland*, 229 N.C. 201, 207, 49 S.E.2d 469, 473 (1948) ). One of the key factors the Court considers in its appraisal is the seriousness or gravity of the incompetent evidence. *Id.* Expulsion from high school is certainly a less serious matter than the commission of three burglaries, the selling of stolen items,

and the existence of the prison record, as in *Wilson*. A second factor the Court considers is the "circumstances of the particular case." *Aycoth*, 270 N.C. at 273, 154 S.E.2d at 61. Here, the State presented two eyewitnesses to circumstances of the shooting. While defendant presented evidence that questioned Norman's motives and his general behavior in the face of a fatal shooting, defendant did not challenge directly Norman's identification of him as the perpetrator. It is notable that in *Wilson* there were no eyewitnesses to the murder. We hold that under the circumstances here, there is no reasonable possibility that the jury's verdict would have been different had the prosecutor not implied that defendant had been expelled from school. *See Wilson*, 311 N.C. at 128, 316 S.E.2d at 53.

[2] Defendant also objected to the following exchange:

Q. So, when you buy your guns, where'd you get the gun from?

Ms. Weigand: Objection.

Court: Overruled.

A. Well, I wouldn't even know that side of town.

Defendant contends the question suggested ongoing criminal conduct on his part. He further contends the implication that he was a gun dealer was prejudicial because his credibility was a key factor in his defense.

The State argues that the question was just one of a series intended to elicit relevant testimony showing defendant knew where the victim lived. Earlier in his cross-examination, defendant had admitted knowing the victim but had denied knowing where he lived. Defendant then admitted that prior to 4 November 1990 he had driven his car to Cummings Avenue and had talked to the victim in front of 1510 Cummings Avenue. Defendant further admitted driving the victim to that address earlier on the day of the shooting. When the prosecutor tried to establish that defendant had been to the address at night, not just during daylight hours, the following exchange occurred:

Q. Yes. And it was that night [the night of the shooting], wasn't it?

A. Yes, I've been over before at night.

. . . .

STATE v. LOCKE

[333 N.C. 118 (1992)]

Q. Driving that black and gold Z-28 Camaro?

A. No. When I pulled in at night time, my dad was driving the car.

. . . .

Q. What were you all doing over there then?

A. We wasn't even going over to that side—he was going to see somebody, that I don't know, to buy a gun. I stayed in the car. He got out and did what he had to do, and came back.

. . . .

Q. You guys kinda hang out in front of 1510, isn't that right?

A. No. I never hung out at 1510.

Shortly after the above exchange, the question to which defendant assigns error occurred. The State argues it is clear from the context that defendant was resisting the admission that he knew the victim lived in the neighborhood of 1510 Cummings Avenue. The particular question was just one more attempt to show defendant's knowledge.

Assuming, without deciding, that it was error to overrule defendant's objection, we hold that in light of the properly admitted evidence, there is no reasonable possibility that information defendant might have been involved in the purchase of guns affected the jury's verdict. *State v. Jolly*, 332 N.C. 351, 363, 420 S.E.2d 661, 668 (1992). First, defendant himself had earlier volunteered information that he knew his father intended to seek and buy a gun when they went together to Cummings Avenue. Second, it is unlikely that exposure of the jury to this tangential information changed the outcome of the trial given properly admitted evidence of defendant's guilt, including eyewitness testimony identifying him as the perpetrator. *Id.*

[3] In his second assignment of error, defendant contends the trial court committed prejudicial error in admitting seven photographs of the victim's body. The State counters that the seven photographs were properly admitted to illustrate the testimony of three witnesses. The victim's brother used one photograph to illustrate the location of and condition in which he found his brother's body. Police crime technician Ron Peak used three photographs to illustrate his testimony about the condition of the victim and

his wounds on the night of the shooting. Finally, examining pathologist James Sullivan used three photographs of the victim's body taken during the autopsy to help explain his testimony about the victim's wounds and the cause of death.

The Court comprehensively addressed the issue of admission of photographs of murder victims' bodies in *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988). That case involved thirty-five gruesome images of the bodies of three victims, two children and their mother. All three victims had suffered multiple stab wounds, the mother had been bound and sexually assaulted, and the bodies had suffered some decomposition. The images were shown to the jury in two forms, slides and photographs. The trial court permitted the construction of a viewing screen large enough to project two images of three feet ten inches by five feet six inches side-by-side on the courtroom wall just over the defendant's head. After showing the slides, large photographs were distributed, one at a time, to the jury. The process of distribution was done in silence and took a full hour.

Under these circumstances, the Court held that the trial court committed prejudicial error in permitting the double admission of the gruesome images, as the macabre nature of the images, their redundancy, and the manner in which they were shown "had potential only for inflaming the jurors." *Hennis*, 323 N.C. at 286-87, 372 S.E.2d at 528. Clearly, we do not have a repeat of the situation in *Hennis* here.

Admissibility of photographic evidence is governed by Rule 403 of the North Carolina Rules of Evidence. *Hennis*, 323 N.C. at 283, 372 S.E.2d at 526. "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitive use is not aimed solely at arousing the passions of the jury." *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526.

While photographs of any murder victim may be unpleasant, by definition, the nature of Tate's death and injuries—bruises and a laceration to the face and entry and exit wounds from a single bullet—are not of the gruesome nature of multiple knife wounds, as in *Hennis*. *See State v. Smith*, 320 N.C. 404, 416, 358 S.E.2d 329, 336 (1987). Nor were the photographs particularly repetitive or numerous. *See State v. Rogers*, 323 N.C. 658, 665, 374 S.E.2d 852, 857 (1989) (nine photographs). All were used to illustrate

testimony of witnesses. The photograph used by the victim's brother "illustrated testimony with respect to the crime scene in general, the location and position of the body when found, and the wounds suffered by the deceased." *Smith*, 320 N.C. at 416, 358 S.E.2d at 336. Of the three photographs used by Ron Peak, one showed the face wounds, one showed the entry wound to the back, and one showed an exit wound under the armpit. The three photographs used by Dr. Sullivan illustrated his opinions that the victim was shot with a large caliber gun while his back was turned from the gun. "Photographs may . . . be introduced in a murder trial to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree . . . ." *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526; *accord State v. Lester*, 294 N.C. 220, 228, 240 S.E.2d 391, 398 (1978). The fact that the victim was shot while his back was turned, as the photographs show, supports the elements of premeditation and deliberation. *State v. Hunt*, 330 N.C. 425, 428, 410 S.E.2d 478, 481 (1991). Under these circumstances, there was no abuse of discretion in admitting the photographs. *Smith*, 320 N.C. at 416, 358 S.E.2d at 336.

NO ERROR.