STATE OF NORTH CAROLINA v. ERNEST A. KING

No. 69A94

(Filed 4 April 1996)

1. **Assault and Battery § 26 (NCI4th)— aggravated assault— intent—acting individually or in concert—sufficiency of evidence**

The evidence was sufficient to allow the jury to reasonably conclude that defendant, individually or in concert with another, intended to and did shoot an assault victim so as to support the trial court's submission to the jury of the charge of assault with a deadly weapon with intent to kill inflicting serious injury where the evidence tended to show that defendant threatened to make Peaks a "ghost" because Peaks had robbed a "lieutenant" in defendant's drug organization; defendant and his accomplice approached Peaks as Peaks was trying to open the back door of a blue car with tinted windows; defendant and his accomplice shot at Peaks and then shot at the blue car; the accomplice fired two .38-caliber handguns, and defendant admitted that he was armed with and fired the entire clip from his 9-millimeter handgun; the victim, who had been shot several times, was found lying in the front seat of the blue car; and a fired 9-millimeter bullet was discovered on the front passenger floorboard of the car near the victim.

**Am Jur 2d, Assault and Battery §§ 92 et seq.**

**2. Evidence and Witnesses § 222 (NCI4th)— high-speed chase four months after crimes—evidence of flight**

The trial court in a murder and assault trial did not err by admitting evidence concerning a high-speed car chase of defendant by a police officer four months after the crimes as evidence of flight and by instructing the jury that it could consider evidence of flight in determining defendant's guilt since (1) there was evidence that defendant fled from Durham to New York after shooting the victims in order to avoid arrest; (2) the four intervening months between the shootings and the car chase did not rob this evidence of its relevance and probative value to show defendant's consciousness of guilt; (3) there is no requirement that defendant be aware of the initiation of formal charges against him for evidence of flight to be admissible upon the question of guilt; (4) the fact that an inference may be drawn that defendant was eluding arrest for more recent offenses does not make the instruction on flight erroneous in this case; and (5) evidence that defendant committed other crimes during the high-speed chase did not render evidence of the chase inadmissible.

**Am Jur 2d, Evidence §§ 532-535.**

**3. Evidence and Witnesses § 2518 (NCI4th)— no possession of weapon by victim—absence of personal knowledge—testimony incompetent but not prejudicial**

Although testimony by a murder victim's sister that the victim did not possess a handgun at the time he was killed because he had pawned his gun two days earlier was relevant to rebut defendant's claim of self-defense, this testimony was a mere conclusion and incompetent because there was no showing that the witness had personal knowledge that the victim did not possess a gun on the day he was killed. However, the admission of this testimony was not prejudicial error where all the testimony at trial tended to show that no weapon was discovered on or around the victim, and the victim's sister had an obvious bias in so testifying. N.C.G.S. § 8C-1, Rule 602.

**Am Jur 2d, Witnesses §§ 178-180.**

**4. Evidence and Witnesses § 357 (NCI4th)— murder trial— details of drug dealings—admissibility to show motive**

Where evidence was presented in a murder trial that the victim had robbed one of defendant's drug "lieutenants" and that

defendant had stated that "nobody was going to take nothing" from him, testimony concerning the details of defendant's drug dealings, including the quantities and street prices of drugs sold, was not improper character evidence but was admissible under N.C.G.S. § 8C-1, Rule 404(b) to show defendant's motive for shooting the victim by showing how much money defendant or his drug organization may have lost from the robbery. If testimony concerning the names, ages and places of birth of defendant's drug dealers was not probative of defendant's motive, such testimony was not prejudicial in light of the overall physical and testimonial evidence presented in the case and the trial court's instruction that evidence of defendant's previous criminal conduct was not evidence of defendant's guilt of the murder.

**Am Jur 2d, Evidence §§ 435, 436.**

**Admissibility, under Rule 404(b) of the Federal Rules of Evidence, of evidence of other crimes, wrongs, or acts similar to offense charged to show preparation or plan. 47 ALR Fed. 781.**

5. **Criminal Law § 555 (NCI4th)— improper testimony— motion for mistrial—sufficiency of curative instructions**

The trial court did not err in the denial of defendant's motion for a mistrial in a murder prosecution when a witness testified that defendant told him that he had already beaten a murder charge in New York and had done "a year on it" where the trial court sustained defendant's objection, allowed a motion to strike, and instructed the jury that "you won't consider that at this time." While it would have been better for the trial court not to have included the words "at this time" in the curative instruction, any prejudice to defendant from this testimony was cured by the curative instruction and the trial court's subsequent instruction that evidence of defendant's previous criminal conduct was not evidence of defendant's guilt in this case.

**Am Jur 2d, Trial §§ 1478-1485.**

6. **Appeal and Error § 150 (NCI4th)— self-incrimination— assertion by defense witness—violation of defendant's rights—failure to preserve issue for appeal**

Defendant failed to preserve for appellate review an issue as to whether his constitutional rights were violated by the trial court's rulings disallowing a defense witness's assertion of his

STATE v. KING

[343 N.C. 29 (1996)]

right against self-incrimination for certain questions and by alleged prosecutorial misconduct in posing questions to the witness when the State knew the witness would invoke his right against self-incrimination in response to those questions where counsel for the witness interposed several objections to safeguard the witness's right against self-incrimination; defense counsel's remarks to the court focused exclusively on protecting the witness's rights and did not inform the court that defendant contended that the prosecutor's questions and the trial court's rulings placed defendant's rights to a fair trial and due process in jeopardy; defendant failed to move for a mistrial; and defendant failed to request that the jury be instructed that it was not to draw any adverse inferences against defendant based on the witness's assertion of his privilege against self-incrimination.

**Am Jur 2d, Appellate Review § 614.**

7. **Evidence and Witnesses § 2983 (NCI4th)— impeachment of defense witness—prior conviction—scope of inquiry—factual elements of crime**

The prosecutor's question to a defense witness as to whether he had been convicted "for kicking Joseph Kinnion in the mouth and cutting him so that he had to get 13 stitches" did not exceed the scope of proper inquiry under N.C.G.S. § 8C-1, Rule 609(d) since the question related to the factual elements of the crime rather than the tangential circumstances of the crime. Even if the question did exceed the proper scope of inquiry, this error was not prejudicial in light of the overwhelming evidence of defendant's guilt.

**Am Jur 2d, Witnesses §§ 862-866, 910-916.**

**Cross-examination of character witness for accused with reference to particular acts or crimes—modern state rules. 13 ALR4th 796.**

**Construction and application of Rule 609(a) of the Federal Rules of Evidence permitting impeachment of witness by evidence of prior conviction of crime. 39 ALR Fed. 570.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Allen (J.B., Jr.), J., at the 13 September 1993 Mixed Session of

Superior Court, Durham County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional conviction was allowed by this Court 7 June 1994. Heard in the Supreme Court 10 April 1995.

*Michael F. Easley, Attorney General, by Mary D. Winstead, Associate Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

Defendant was tried noncapitally for the first-degree murder of Meredith Mark Peaks and for the assault with a deadly weapon with intent to kill inflicting serious injury upon Earl Green. The jury returned verdicts of guilty of first-degree murder and guilty of assault with a deadly weapon inflicting serious injury. Judge Allen sentenced defendant to life imprisonment for the murder and ten years for the assault, the sentences to run consecutively. We find no prejudicial error and, accordingly, uphold defendant's convictions.

The evidence presented at trial tended to show that defendant, Ernest A. King, also known by the nickname, "O," operated a drug-selling organization in Durham near the Commerce Street Housing Project in the early part of 1992. Eric Shaw sold cocaine for defendant and testified for the State as an eyewitness. According to Shaw, defendant regularly carried a 9-millimeter handgun which he kept tucked in the front of his pants. Another of defendant's workers, "Face," carried two .38-caliber handguns; one he tucked in the side of his pants, and one he carried in his hand.

The victim, Meredith Mark Peaks, was known as a "stick-up" man who robbed drug dealers of their cash and drugs. On occasion, Shaw had been involved with Peaks in such activities. Shaw explained that a few days before Peaks' murder, Peaks robbed one of defendant's workers, Merk. When Merk told defendant about the robbery, Shaw heard defendant remark that "nobody was going to take nothing" from him.

On 20 February 1992, Shaw and defendant's other workers were selling drugs for defendant when Shaw heard Peaks yell out, "None of these m——-f——— are going to do nothing to Mark Peaks." Defendant asked who had yelled and was told that it was Peaks. Defendant replied, "I'm going to make him a ghost." According to

Shaw, that meant defendant was going to kill Peaks. Defendant instructed Shaw to shoot Peaks in the legs if he came towards him so Peaks could not get away. As Peaks reached to open the back door of a blue car with tinted windows, defendant and "Face" approached. Peaks faced defendant and asked, "What's up?" Defendant responded, "F— that s—," and he and "Face" began to shoot at Peaks and then at the car. After defendant finished shooting, he turned to walk away, but went back to Peaks, leaned over and shot him once more saying, "Now you're a ghost." With that, defendant got into a car and drove away.

Officer Richard Smith, the first officer at the scene, arrived only minutes after the shooting. Approximately 150 to 200 yards from Commerce Street, Officer Smith found a black male, later identified as Peaks, lying facedown in a parking lot to the left rear of a blue car. Peaks had suffered nine gunshot wounds to the head, chest, arm and legs. There were bullet holes in the windshield of the car, and several shell casings and bullet fragments were found near Peaks' body. Officer S.T. Brame arrived at the scene just after Officer Smith. As the officers were securing the scene, the horn of the blue car sounded, and Officer Smith saw a foot fall out of the car. Officer Smith discovered Earl Green lying across the front seat of the car. He had been shot in the penis, both upper legs and the left knee. A police identification technician discovered a fired 9-millimeter bullet on the front, passenger floorboard of the car. No weapons of any kind were found around the car, on Mark Peaks or on Earl Green.

Of the bullets recovered from the scene, it was determined that five 9-millimeter bullets were fired from the same gun. Two .38-caliber bullets were fired from another gun, and three .38-caliber bullets were fired from a third gun. Thus, one 9-millimeter handgun and two .38-caliber handguns had fired these bullets.

Defendant was arrested in Virginia and was extradited to North Carolina on 10 July 1992 to face the charges against him.

Defendant presented evidence and testified on his own behalf that he was from Brooklyn, New York, and moved to Durham in the early part of 1992. Defendant testified that on 20 February 1992, he saw Peaks sitting on the trunk of a blue car. Another stocky male was standing next to Peaks. Defendant did not know Peaks and did not recognize the other male, but defendant had heard Peaks' name many times. As defendant walked by, he observed Peaks carefully because of "the type of business [defendant] was into." Peaks asked defendant

for a light, and defendant told Peaks he did not smoke. Defendant became suspicious of the conversation because, as defendant explained, "The type of things that I was involved with I know you have to be cautious every day and I have been hurt before. I have hurt people before." Defendant had just decided to put some distance between himself and Peaks when he heard Peaks say, "Don't move." Peaks shot at defendant and defendant ducked behind the blue car. Defendant fired the entire clip of his 9-millimeter handgun at Peaks; defendant did not reload because he did not have another clip with him. Defendant could not tell where the stocky male with Peaks had gone. After the shooting, defendant ran away on foot. He left Durham later that night and drove to New York, by himself, to get the gun out of North Carolina.

Defendant further admitted that he brought cocaine from New York to Durham to sell every one and one half to three weeks. He never sold this cocaine himself; rather, he "fronted" cocaine to his workers, who sold the drug and brought the money back to him. Defendant denied that Eric Shaw sold drugs for him. Defendant also explained that Merk "was not a street level dealer[;] Merk was more what you would call a lieutenant." Merk's job was to collect money from the workers when defendant was not around. Defendant admitted he had heard of Peaks' reputation as a robber, but denied that any of his workers had been robbed. Defendant also testified that if one of his workers was robbed, he would not feel compelled to do anything about it.

Defendant brings forward seven assignments of error.

[1] Defendant first argues it was error for the trial court to deny his motion to dismiss the charge of assault with a deadly weapon with intent to kill inflicting serious injury based on the insufficiency of the evidence. The jury convicted defendant of assault with a deadly weapon inflicting serious injury. Defendant contends his conviction must now be set aside because no substantial evidence demonstrates defendant, individually or in concert with another, shot Earl Green; and no substantial evidence demonstrates defendant, individually or in concert with another, intended to shoot Earl Green. Based upon our review of the record, we conclude the evidence in these respects was sufficient for the jury's consideration and determination.

The essential elements of assault with a deadly weapon with intent to kill inflicting serious injury are: "(1) an assault, (2) with a deadly weapon, (3) with intent to kill, (4) inflicting serious injury, (5)

not resulting in death." *State v. Reid*, 335 N.C. 647, 654, 440 S.E.2d 776, 780 (1994). This Court has concluded the following regarding the theory of acting in concert:

> It is not . . . necessary for a defendant to do any particular act constituting at least part of a crime in order to be convicted of that crime under the concerted action principle so long as he is present at the scene of the crime and the evidence is sufficient to show he is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime.

*State v. Joyner*, 297 N.C. 349, 357, 255 S.E.2d 390, 395 (1979).

The law concerning motions to dismiss is well settled. "If there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988). Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *State v. Vause*, 328 N.C. 231, 400 S.E.2d 57 (1991). The evidence must be viewed in the light most favorable to the State, and the State must receive every reasonable inference to be drawn from the evidence. *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980). Any contradictions or discrepancies arising from the evidence are properly left for the jury to resolve and do not warrant dismissal. *Id.* at 99, 261 S.E.2d at 117.

Viewing the evidence in the light most favorable to the State and drawing all reasonable inferences in its favor, the testimony of eyewitness Eric Shaw tended to show that defendant threatened to make Mark Peaks a "ghost" because Peaks had robbed Merk, a "lieutenant" in defendant's drug organization. On 20 February 1992, Peaks went to the housing project, and defendant instructed Eric Shaw to shoot Peaks in the legs so Peaks could not run away. Defendant and "Face" approached Peaks as Peaks was trying to open the back door of a blue car with tinted windows. Defendant and "Face" shot at Peaks, and then they shot at the blue car. While Shaw testified he did not see anyone else at the car, he believed that someone may have been inside the blue car because Peaks was trying to open the back door.

The police arrived at the scene only minutes after the shots were fired. They heard the car horn sound and found Earl Green lying in

the front seat. He had been shot several times, twice in the upper legs and once in the left knee. The emergency medical technician assigned to Green noticed bullet holes in the car windshield, and a fired 9-millimeter bullet was discovered on the front, passenger floorboard of the car. Shaw testified, and defendant admitted, he carried a 9-millimeter handgun. Further, Shaw testified "Face" carried two .38-caliber handguns. The bullets recovered at the crime scene indicated that three guns had fired them: one 9-millimeter handgun and two .38-caliber handguns.

Defendant himself admitted that a stocky male was with Peaks when defendant and "Face" approached the car. Further, Herbert Blue, who met defendant in Central Prison after the shooting, testified that defendant asked him how Earl Green was doing.

From the totality of the evidence, we conclude that a jury could reasonably infer and find as fact that Earl Green was in the driver's seat inside the blue car when defendant and "Face" began to shoot Peaks. Seeing Green inside the car, defendant and "Face" shot at the car, hitting Green in the legs, the same place defendant had earlier instructed Shaw to shoot Peaks. Defendant, by his own admission as well as the testimony of Shaw, was armed with and fired the entire clip from his 9-millimeter handgun that night. A fired 9-millimeter bullet was discovered on the front, passenger floorboard of the car near Green. We conclude this evidence was sufficient to allow a jury to reasonably conclude defendant, individually or in concert with another, intended to shoot, and did shoot, Earl Green. This assignment of error is overruled.

[2] Defendant next contends the trial court erred in admitting evidence concerning a high-speed car chase between defendant and Officer Steve Campbell as evidence of flight and in instructing the jury that it could consider evidence of flight in determining defendant's guilt. We do not agree.

At trial, the State presented evidence that on 2 July 1992, Officer Campbell responded to a radio call for assistance to stop a 1985 Audi. Officer Campbell followed the Audi at speeds of over one hundred miles per hour. As the Audi approached a sharp turn, it hit a car and a telephone pole, became airborne, landed on top of another car and crashed into the side of a house. Officer Campbell saw a male, whom he later identified at trial as defendant, run from the Audi and into some woods. Officer Campbell chased defendant through these woods on foot but without success. Defendant was arrested in

Virginia and was extradited to North Carolina on 10 July 1992. The trial court overruled defendant's objection to the admission of the testimony and allowed the State to offer Officer Campbell's testimony to the jury as evidence of flight.

Evidence of a defendant's flight following the commission of a crime may properly be considered by a jury as evidence of guilt or consciousness of guilt. *State v. Lampkins*, 283 N.C. 520, 196 S.E.2d 697 (1973). "[A] trial court may not instruct a jury on defendant's flight unless 'there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged.' " *State v. Levan*, 326 N.C. 155, 164-65, 388 S.E.2d 429, 433-34 (1990) (quoting *State v. Irick*, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977)). "[T]he relevant inquiry [is] whether there is evidence that defendant left the scene of the murder and took steps to avoid apprehension." *Levan*, 326 N.C. at 165, 388 S.E.2d at 434.

According to defendant, Officer Campbell's testimony should not have been received as evidence of flight because it was irrelevant and amounted to inadmissible "other crimes" evidence prohibited by Rule of Evidence 404. Defendant makes several arguments in support of this position. First, defendant claims that the State failed to produce any evidence that defendant fled after the shooting on 20 February 1992. Based on our review of the record, we conclude that the record does contain evidence from which a jury could reasonably find that defendant fled after shooting Peaks and Green in order to avoid arrest. Defendant himself volunteered the following testimony during his cross-examination at trial:

Q. Did you see [Peaks] fall on his front or his back?

A. I can't say how he fell because I didn't look back. I just kept running.

Q. Where did you go?

A. I ran through the projects across Liberty Square to some more apartments and jumped over the fence and ran up a hill . . . . And then [I] went to the back of the Channel 11 news room. . . . I took . . . whatever the name of the street is tó Fargo Street.

Q. Was anybody with you?

A. No. I was by myself on feet [sic].

Q. Okay. Now, what did you do with the gun?

A. The gun is in New York.

Q. What is the gun doing in New York?

A. I wanted to get rid of it. I wanted to get it out of the [S]tate of North Carolina.

Q. Okay. How did you get the gun to New York?

A. Car. Drove it.

Q. You drove it up there?

A. Yes.

Q. Was anybody with you?

A. No. I was by myself. I left the city that night.

Q. You went to New York?

A. Yes.

Q. How long did you stay in New York?

A. About a good week you know.

Thus, by defendant's own admission, he fled from Durham to New York and stayed "a good week" in order to hide his 9-millimeter handgun. On this evidence alone, the trial court's instruction on flight was justified, as the evidence tends to demonstrate defendant "left the scene of the murder and took steps to avoid apprehension." *Levan*, 326 N.C. at 165, 388 S.E.2d at 434.

Second, defendant proposes that in light of the four intervening months between the date of the shooting on 20 February 1992 and the date of the car chase on 2 July 1992, the car chase is irrelevant to the shooting and cannot reasonably justify an inference that defendant fled to avoid arrest for the shooting. Relevant evidence is that evidence which makes any fact "of consequence to the . . . action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). As a general rule, relevant evidence is admissible, N.C.G.S. § 8C-1, Rule 402 (1992); however, relevant evidence may be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice," N.C.G.S. § 8C-1, Rule 403 (1992).

In *State v. McDougald*, 336 N.C. 451, 444 S.E.2d 211 (1994), the defendant was arrested on 5 April 1991 and escaped from the Hoke

County Jail on 19 August 1991. This Court held that evidence of defendant McDougald's escape from jail, four months after his arrest, was both relevant and probative to show flight, as it tended to show defendant's consciousness of guilt. *Id.* at 457, 444 S.E.2d at 214. We find *McDougald* controlling on this issue in the present case and conclude likewise that the four intervening months between the shooting and the high-speed chase from police did not rob the evidence of the car chase of its relevance and probative value to show defendant's consciousness of guilt.

Third, defendant contends that at the time of the car chase, he did not know he was wanted for the murder of Peaks and the assault of Green; thus, the car chase cannot indicate his consciousness of guilt for the offenses. This Court has not required, and we decline to rule now, that a defendant be aware of the initiation of formal charges against him before evidence of flight is admissible to bear upon the question of guilt. To do so would ignore our explicit recognition of the fact that evidence of flight is competent on the question of guilt because it is " 'a guilty *conscience* [which] influences conduct.' " *State v. Jones*, 292 N.C. 513, 525, 234 S.E.2d 555, 562 (1977) (emphasis added) (quoting *State v. Steele*, 190 N.C. 506, 511, 130 S.E. 308, 312 (1925)). Further, "[t]he cases in which evidence of flight has been declared competent when the flight occurred before arrest . . . are legion." *State v. Mash*, 305 N.C. 285, 288, 287 S.E.2d 824, 826 (1982). Because a guilty conscience, completely apart from the initiation of formal charges, influences conduct, we reject defendant's contention in this regard.

Fourth, defendant proposes that because he had committed other, more serious offenses after 20 February 1992, the car chase could not have been indicative of his consciousness of guilt for the murder of Peaks and the assault of Green. Rather, defendant appears to argue that his flight from police indicates his consciousness of guilt for the other, more recent offenses. This Court has held that "[s]o long as there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged, the instruction is properly given. The fact that there may be other reasonable explanations for defendant's conduct does not render the instruction improper." *Irick*, 291 N.C. at 494, 231 S.E.2d at 842. While it may be true that defendant had committed other offenses, even more serious ones, between the time of the shooting and the car chase and an inference may be drawn that defendant was eluding arrest for the more recent offenses, simply because such an inference

can be drawn does not make the instruction as to flight erroneous in this case. The record reveals there was competent evidence of flight, and based on such evidence, the trial court correctly instructed the jury as to flight.

Finally, defendant contends that evidence of the car chase was improper because it contained evidence defendant sped through the streets at speeds of over one hundred miles an hour, ran into two cars, knocked down telephone poles and crashed into a house, thus amounting to "other crimes" evidence prohibited by Rule of Evidence 404. This Court, however, has stated that "[e]ven though the evidence of flight may disclose the commission of a separate crime by defendant, it is nonetheless admissible." *State v. Jones*, 292 N.C. 513, 526, 234 S.E.2d 555, 562. So it is with the present case.

We conclude that evidence of the car chase was properly received as evidence of flight and was sufficient to support the trial court's instruction on flight. Accordingly, this assignment of error is overruled.

[3] In his next assignment of error, defendant argues it was error for the trial court to admit the allegedly incompetent testimony of Tammy Peaks, the victim's sister.

In order to rebut defendant's claim of self-defense, the State sought to present the testimony of the victim's sister, Tammy Peaks, that the victim did not possess a gun at the time he was killed because he had pawned his gun two days earlier. Defendant objected and a *voir dire* was held during which Tammy Peaks testified that the victim carried a .357-caliber handgun. She further stated that he did not have a handgun on the day of the shooting because she went with him to pawn the gun on 18 February 1992 at a grocery store on Geer Street. The trial court overruled defendant's objection, and Tammy Peaks offered essentially this same testimony before the jury.

Under Rule of Evidence 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that [she] has personal knowledge of the matter." N.C.G.S. § 8C-1, Rule 602 (1992). We note initially that Tammy Peaks' testimony that the victim pawned his .357-caliber handgun two days before he was killed was relevant to rebut defendant's claim of self-defense. However, we agree with defendant that the record does not reveal that Tammy Peaks had personal knowledge that the victim did not possess a gun the day he was killed. No evidence demonstrates that Tammy Peaks

was with, or talked with, her brother, the victim, on 20 February 1992. During the two days, it is possible that the victim reacquired his gun, or got another gun. Thus, Tammy Peaks' testimony that the victim did not possess a gun the day he was killed was a mere conclusion and was incompetent, as there was no showing that she had personal knowledge of such a fact. *See State v. Wilson,* 338 N.C. 244, 449 S.E.2d 391 (1994). However, based upon this record, we conclude this error was not prejudicial. All the testimony at trial tends to show that no weapon of any kind was discovered on or around Mark Peaks or Earl Green. Further, Tammy Peaks, as the sister of the victim, had an obvious bias. The trial court instructed the jury that it was the sole judge of the credibility of each witness and that bias was a factor it could weigh in determining whether to believe all, part or none of a witness' testimony. There is no reasonable possibility that had the testimony not been received, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988). This assignment of error is therefore overruled.

**[4]** Defendant next argues that the admission of testimony from Eric Shaw regarding defendant's drug dealing activities was error pursuant to Rule of Evidence 404(b).

During the direct examination of eyewitness Eric Shaw, Shaw testified he was acquainted with the defendant "through drugs." Defendant objected and a lengthy *voir dire* was held. After the *voir dire,* the trial court made findings of fact and concluded that Shaw's testimony concerning the details of defendant's drug dealings was relevant and admissible under the motive and intent exceptions to the prohibition against character evidence contained within Rule of Evidence 404(b). Additionally, the trial court concluded that the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice. Before this Court, defendant candidly concedes that some information regarding his drug operation, such as when it existed and from where it was operated, was admissible under the Rule 404(b) exception of motive. However, defendant contends that Shaw was improperly allowed to testify to the names of defendant's drug dealers; their ages and places of birth; the drug operation's hours; the amount, quantities and street prices of cocaine sold; and the manner in which defendant oversaw his drug organization. This testimony, defendant argues, amounted to improper character evidence and did not meet any of the enumerated exceptions contained in Rule 404(b).

Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive." N.C.G.S. § 8C-1, Rule 404(b) (1992). This Court has emphasized that Rule 404(b) is a "rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show . . . defendant has the propensity . . . to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990).

On the facts of this case, we agree with the State that the disputed evidence was relevant to show defendant's motive for Peaks' murder. The record reveals the State's theory at trial was that defendant, a transplanted New York drug dealer, murdered Peaks to avenge Peaks' robbery of one of defendant's "lieutenants." Evidence was presented that Peaks had robbed one of defendant's drug "lieutenants," and defendant had stated that "nobody was going to take nothing" from him. Given that this case was inextricably tied to the drug trade in light of defendant's admitted occupation and Peaks' reputation, how much money defendant's workers made from the sale of cocaine and turned over to defendant was relevant to show how much money defendant or his drug organization may have lost as a result of Peaks' robbery, thus demonstrating defendant's motive to kill Peaks. *See State v. Ligon*, 332 N.C. 224, 420 S.E.2d 136 (1992) (evidence that defendant dealt drugs properly admitted to show motive under Rule of Evidence 404(b) where State contended the victim was shot when he tried to steal cocaine from defendant). While testimony concerning the names of all defendant's drug dealers and their ages and places of birth may not have been probative of defendant's motive, in light of the overall physical and testimonial evidence presented in this case, there is no reasonable possibility a different result would have been reached at trial absent this slight information. N.C.G.S. § 15A-1443(a). We also note that the trial court cautioned the jury that evidence of defendant's previous criminal conduct was "not evidence of the defendant's guilt in this case. You may not convict him on the present charge because of something he may have done in the past." This assignment of error is overruled.

[5] Defendant's next argument concerns the trial court's allegedly erroneous denial of defendant's motion for a mistrial based on a witness' testimony that defendant had previously "beaten" a murder charge.

Herbert Blue, testifying for the State, stated that defendant told Blue "he had already beat[en] one murder case in New York" and that defendant had done "a year on it." Defendant objected, moved to strike and asked for a curative instruction. The trial court sustained the objection, allowed the motion to strike and instructed the jury as follows: "[L]adies and gentlemen, you won't consider that at this time." After Blue's testimony, defendant asked to be heard outside the presence of the jury and moved for a mistrial. The trial court denied the motion.

The trial court is required to declare a mistrial upon a defendant's motion "if there occurs during the trial . . . conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C.G.S. § 15A-1061 (1988). It is well settled that a motion for a mistrial and the determination of whether defendant's case has been irreparably and substantially prejudiced is within the trial court's sound discretion. *State v. Williamson*, 333 N.C. 128, 423 S.E.2d 766 (1992). The trial court's decision in this regard is to be afforded great deference since the trial court is in a far better position than an appellate court to determine whether the degree of influence on the jury was irreparable. *Id.* at 138, 423 S.E.2d at 772. Further, "[w]hen the trial court withdraws incompetent evidence and instructs the jury not to consider it, any prejudice is ordinarily cured." *State v. Black*, 328 N.C. 191, 200, 400 S.E.2d 398, 404 (1991). Defendant contends, however, that the trial court's instruction left the prejudice to defendant uncured in that the instruction was vague and indefinite because it was not addressed to the jury, did not explain what the jury was not to consider, and implied that the jury could consider the evidence at a later time.

In considering the context of the entire exchange, including the objection, motions to strike and for curative instructions, and the trial court's ruling thereon in favor of defendant, we believe the jurors certainly understood that the trial court was addressing its instruction to them and that they were not to consider Blue's statement. *See State v. Locke*, 333 N.C. 118, 423 S.E.2d 467 (1992) (trial court's curative instruction informing the jury only to "disregard," coupled with sustaining the defendant's objection, was sufficient to cure any prejudice). While in the instant case it would have been better for the trial court not to have included the words "at this time" in the curative instruction, we note that the trial court further cautioned the jury during jury instructions that evidence of defendant's previous criminal conduct was "not evidence of the defendant's guilt in this case. You

STATE v. KING

[343 N.C. 29 (1996)]

may not convict him on the present charge because of something he may have done in the past." Our system of trial by jury is "based upon the assumption that the trial jurors are men [and women] of character and of sufficient intelligence to fully understand and comply with the instructions of the court, and are presumed to have done so." *State v. Ray*, 212 N.C. 725, 729, 194 S.E. 482, 484 (1938). We conclude that the trial court's curative instruction, taken in conjunction with the trial court's later instruction, was sufficient to cure any prejudice which inured to defendant and that the trial court did not abuse its discretion in denying defendant's motion for a mistrial. This assignment of error is overruled.

[6] Defendant next argues that he is entitled to a new trial because of the trial court's erroneous rulings disallowing defense witness Mark Jones' assertion of his Fifth Amendment right against self-incrimination and because of the State's alleged prosecutorial misconduct in posing questions to Jones when the State knew Jones would invoke his Fifth Amendment privilege in response.

Before defendant offered the testimony of Jones, defendant informed the trial court that Jones was in Central Prison awaiting a capital first-degree murder trial. Jones' attorney, Mark Edwards, who was present in court, asked the trial court's permission to allow him to interpose objections where appropriate in order to safeguard Jones' Fifth Amendment right against self-incrimination. The trial court allowed Edwards' request. Outside the presence of the jury, the trial court ascertained that Jones had spoken with his attorney and that he understood his Fifth Amendment privilege and that he still wished to testify.

Before the jury, Jones testified for the defense on direct examination that he knew Eric Shaw from prison. To Jones' knowledge, Shaw had never sold drugs for the defendant, and Shaw and Peaks were good friends. Further, Jones testified on direct examination that Shaw had admitted to him that Shaw was not an eyewitness to Peaks' murder as he had claimed when he testified for the State. Shaw told Jones that he was going to get the defendant and boasted that had Shaw been present the night of Peaks' murder, Peaks would not have been killed. The State's cross-examination of Jones transpired in part as follows:

Q. Well, isn't it true in the past you owed some New York boys money for drugs?

MR. EDWARDS: Your honor, I object and I advise him not to answer the question.

COURT: I think this is a proper cross examination question due to the evidence that has come out and I will instruct you to answer that question.

MR. EDWARDS: Judge, I would ask if we can approach the bench please.

COURT: I will let the jury go out and be heard on the record.

. . . .

MR. EDWARDS: I think the line of inquiry the State is going into now . . . regards [its] theory of prosecution on the murder case. I believe that the theory is that Mr. Jones owed Deca money and that was part of the reason or part of the motive for what happened . . . . I'm afraid we're getting into the area of the facts of [Jones'] particular case.

COURT: As an officer of the Court I want you to tell me what is the basis of that question on cross examination?

. . . .

[PROSECUTOR]: Mark Jones owed New York people money for drugs. . . . My contention would be that if he owes what are classified as the New York boys for drugs that that is relevant in terms of his motivation to lie for other New York boys that are part of that very broad group.

The trial court ordered Jones to answer the question, and the jury was brought back into the courtroom. The prosecutor asked Jones again if he owed any money to New York boys for drugs. Jones refused to answer the question, and the trial court sent the jury out of the courtroom again. The trial court instructed Jones once more that he had to answer the question or be held in contempt. The jury was summoned back to the courtroom, and the prosecutor again asked the question; Jones continued to refuse to answer. The jury was taken out of the courtroom again, and the trial court found Jones in contempt. The trial court also admonished spectators in the courtroom who were laughing that the court would not tolerate such behavior.

With the jury once more in the courtroom, the prosecutor delved into a new area of cross-examination by asking Jones if Jones had a reputation for robbing drug dealers. Jones refused to answer this

question, and the trial court sent the jury out and ordered Jones to answer the question. In front of the jury, Jones again refused. The jury was sent out once more, and the trial court found Jones in contempt for the second time.

Defendant argues before this Court that the trial court's rulings were improper as a matter of law and that the prosecutor engaged in prosecutorial misconduct by repeatedly asking Jones questions when the prosecutor knew Jones would continue to assert his Fifth Amendment right against self-incrimination. Defendant claims the proceedings were turned into a circus as evidenced by the fact that the jury was sent out of the courtroom seven times during Jones' testimony and that spectators in the courtroom were laughing. The State responds that defendant has failed to properly preserve this issue for appellate review. We agree with the State in this regard.

The Fifth Amendment right against compulsory self-incrimination was made applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653 (1964). "Under the Fifth Amendment to the United States Constitution and Article I, § 23 of the North Carolina Constitution, a witness cannot be compelled to give self-incriminating evidence." *State v. Ray*, 336 N.C. 463, 468, 444 S.E.2d 918, 922 (1994). When a witness invokes the Fifth Amendment privilege, the trial court is to "determine whether the question is such that it may reasonably be inferred that the answer may be self-incriminating." *State v. Eason*, 328 N.C. 409, 418, 402 S.E.2d 809, 813 (1991). However, when the witness who invokes the Fifth Amendment is a witness for the defense and the defendant fails to object at trial to the witness' invocation of the Fifth Amendment, this Court has refused to require the trial court, upon its own motion, to conduct a *voir dire* to determine whether there is a proper basis for the witness' Fifth Amendment invocation. *State v. Maynard*, 311 N.C. 1, 316 S.E.2d 197, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984).

The record reveals that during the course of Jones' cross-examination, Jones' attorney, Mr. Edwards, interposed several objections to safeguard Jones' right against self-incrimination. However, defendant's attorney addressed the trial court only once, and that was at the trial court's invitation:

COURT: Do you want to be heard, Mr. Cotter?

[DEFENSE COUNSEL]: Yes, sir. As you know[,] the kind of information that this young man doesn't have to answer is not only

information that directly involves him in some wrongdoing but anything that can lead up to that. It sounds to me like these questions are more for . . . discovery purposes [for Jones' trial]. . . . I would ask, Your Honor, not to make him answer questions that lead to incriminating information because that's what the rule states.

It is clear from these remarks that defense counsel's comments were not interposed for the purpose of protecting *defendant's* rights, constitutional or otherwise. Defendant's counsel did not articulate how requiring Jones to answer allegedly improper questions, or how Jones' continued invocation of his right, would damage defendant. Indeed, defendant was not mentioned in this one exchange between defense counsel and the trial court. Rather, defense counsel's remark was focused exclusively on protecting Jones' Fifth Amendment rights. Certainly, had defendant believed his rights to a fair trial and due process were violated, as he now argues, by the trial court's rulings requiring Jones to answer the cross-examination questions and by the alleged prosecutorial misconduct, defendant easily could have moved for a mistrial as he had earlier in the trial. He did not so move. We also note that had defendant believed it necessary, he could have requested that the jury be instructed that Jones was merely exercising a legitimate constitutional right and that the jury was not to draw any adverse inferences against defendant based on Jones' assertion of his privilege against self-incrimination. Again, defendant elected not to choose this option. Because defendant never made the trial court aware that the manner in which the questions were proffered and that the trial court's rulings were in some manner objectionable to *him*, thereby placing *his* rights to a fair trial and due process in jeopardy, he cannot advance this claim now, for the first time, on appeal. *See* N.C. R. App. P. 10(b)(1). "The theory upon which a case is tried in the lower court must control in construing the record and determining the validity of the exceptions. Further, a constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal." *State v. Hunter*, 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982). "[T]he law does not permit parties to swap horses between courts in order to get a better mount in the Supreme Court." *Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934). Accordingly, this assignment of error is overruled.

[7] In his last assignment of error, defendant contends that defense witness Jones was improperly impeached. The State asked Jones the following question on cross-examination: "Isn't it true that on

October 9th of last year Judge Titus . . . gave you a 90-day sentence for kicking Joseph Kinnion in the mouth and cutting him so that he had to get 13 stitches?" Defendant argues that because the question included the specifics of the crime, that is, kicking Joseph Kinnion in the mouth and cutting him so that he had to get 13 stitches," the impeachment question exceeded the scope of proper inquiry under Rule of Evidence 609(a).

The credibility of a witness may be attacked on cross-examination by "evidence that [the witness] has been convicted of a crime punishable by more than 60 days confinement." N.C.G.S. § 8C-1, Rule 609(a) (1992). In *State v. Lynch*, 334 N.C. 402, 432 S.E.2d 349 (1993), this Court, faced with conflicting lines of authority concerning the proper scope of inquiry regarding impeachment under Rule 609(a), reaffirmed the rule set out in *State v. Finch*, 293 N.C. 132, 235 S.E.2d 819 (1977), a pre-Rules case, "prohibiting the State from eliciting details of prior convictions other than the name of the crime and the time, place, and punishment for impeachment purposes under Rule 609(a) in the guilt-innocence phase of a criminal trial." *Lynch*, 334 N.C. at 410, 432 S.E.2d at 353. Under this rule, this Court held that the questions posed by the State in *Lynch* concerning exactly what type of weapon defendant Lynch used in five of his prior convictions exceeded the scope of proper inquiry and warranted a new trial. Additionally, the Court distinguished the improper questions posed in *Lynch* from the questions posed in *State v. Murray*, 310 N.C. 541, 313 S.E.2d 523 (1984) (a pre-Rules case), *overruled on other grounds by State v. White*, 322 N.C. 506, 369 S.E.2d 813 (1988), by reasoning that "[t]he questions asked of the defendant in *Murray* related to the factual elements of the prior offenses and were descriptive of the particular crimes of which the defendant had been convicted. The questions did not relate to tangential circumstances of the offenses involved, as did the questions here." *Lynch*, 334 N.C. at 409, 432 S.E.2d at 352.

We conclude that the State's single question related to the factual elements of the crime rather than the tangential circumstances of the crime. Under *Lynch*, the State was entitled to inquire about the name of the crime for which Jones was convicted. Had the prosecutor referred to the crime by name, he would have asked if Jones had been convicted of assault inflicting serious injury. Instead, the State simply asked about the factual elements of the crime, whether Jones had been convicted of "kicking Joseph Kinnion in the mouth and cutting him so that he had to get 13 stitches." Even assuming, *arguendo*, that

the question in this instance did exceed the proper scope of inquiry, any error was not prejudicial. The record reveals that this question was asked only one time and that it was not asked of the defendant as were the questions in *Lynch*, but rather was asked only of a defense witness. *See Lynch*, 334 N.C. at 406-08, 432 S.E.2d at 351-52. In light of the overwhelming evidence of defendant's guilt, there is no reasonable possibility a different result would have been reached at trial absent the alleged error. N.C.G.S. § 15A-1443(a). This assignment of error is overruled.

For the foregoing reasons, we conclude that defendant received a fair trial, free from prejudicial error.

NO ERROR.