An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1281

NORTH CAROLINA COURT OF APPEALS

Filed: 3 June 2014

STATE OF NORTH CAROLINA

    v.

LAMATE SHERRON ANDERSON

Union County
No. 10 CRS 51012

Appeal by Defendant from judgment entered 7 March 2013 by Judge W. David Lee in Superior Court, Union County. Heard in the Court of Appeals 6 May 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General Daniel P. O'Brien, for the State.*
>
> *Glover & Petersen, P.A., by Ann B. Petersen, for Defendant.*

McGEE, Judge.

Lamate Sherron Anderson ("Defendant") stabbed Yolanda Simon ("Ms. Simon") multiple times in the throat, arms, and torso on 28 February 2010. Ms. Simon died from these wounds. Some months earlier, Defendant had briefly dated Ms. Simon's cousin. Defendant lived in a house across the street from where Ms. Simon lived with her fiancé and their six-year-old daughter. Ms. Simon's cousin also lived with them. Ms. Simon's daughter

witnessed the killing and, shortly after the attack, the police apprehended Defendant at his house.

Defendant admitted to killing Ms. Simon, but at trial argued he was legally insane at the time of the attack or, in the alternative, was operating under diminished capacity. Defendant was interviewed by Monroe Police Department investigators on 28 February 2010, and agreed to talk with the investigators after having waived his *Miranda* rights. When Defendant was asked why he had killed Ms. Simon, he stated he had been hearing voices in his head since 2008, "[a]nd it was just all the pressure and I guess . . . frustration and aggravation of the world and everything going on around me and then I'm hearing the voices." Defendant stated he knew that what the voices were telling him was wrong, and that he was trying to avoid "anything that would hurt me or my family or anything to give them [the voices] satisfaction of me you know doing the wrong thing. I was trying to avoid it." Defendant stated that when the voices would say things to him, he

> knew it was a lie. The first time they [the voices] told me [that something bad was going to happen to my family] you know I uh, just to be natural I worried about it. You know, I got home it . . . wasn't what [the voices] said it was so I stopped worrying.

Defendant would hear voices like "the devil was under [his] bed" or in the closet, but he thought "well the devil ain't under my bed or in the closet so I ain't gonna worry about it[.]"

After a while, the voices began telling Defendant he was either "gonna be gay" or was going to "be a killer." When asked what made him go over to Ms. Simon's house on 28 February 2010, Defendant said:

> Nothing in particular about her. It was just you know . . . . I was trying to teach them a lesson. I hopefully trying to do something spiritual warfare. . . . . I was like hopefully, I was like, I was saying if I did this to her, not just her, but anybody in particular, it . . . it's just random man. . . . Maybe they would stop talking to me or leave me alone.

Defendant said he had "thought about going to the doctor. I thought maybe something might of crawled into my ear or might have been eating on my brain and I was just hearing voices in my head because of that fact. But I never did."

Defendant went across the street to Ms. Simon's house, holding a pocket knife that already had the blade open. He said the voices had been challenging him to kill someone to prove that he was a man. When he got to Ms. Simon's house, he rang the doorbell. When Ms. Simon answered the door, Defendant stabbed her immediately in the throat, then stabbed her more times in her side and neck, and then went home. While Defendant

was stabbing Ms. Simon, he asked her "why she let her cousin play in my head in the dark." When Ms. Simon asked Defendant "when," Defendant told Ms. Simon to "shut up" and kept stabbing her. Defendant stated that he "was praying for the best even though [he] knew [he] did the wrong thing." When an investigator said to Defendant, "so you know what you did was wrong[,]" Defendant said that he did. Defendant was also asked, "when you went over there did you plan on stabbing her when you went in there? Did you go over there with the intention of stabbing her?" Defendant answered: "Yeah, I went over there with the knife flipped out." Defendant said he wasn't sure if he would have killed Ms. Simon's daughter had she opened the door, but that he would have stabbed Ms. Simon's cousin.

When Defendant returned home, he put his shirt in the washing machine, "[b]ecause [he] knew [he] had . . . blood on it." Defendant also washed the blood off the knife and took a shower. Defendant told the investigators: "I know it's not okay. I know it will never be okay again for me or her family. I know it won't." Defendant stated: "I don't think I'm crazy or insane, but I don't think I had full control over . . . my actions."

Defendant was found guilty of first-degree murder on 7 March 2013. Defendant appeals.

I.

In Defendant's first argument, he contends the trial court erred in allowing the State's expert witness to testify "that the term diminished capacity was misleading and then allowing him to define the criteria for it in a manner that was legally incorrect." We disagree.

Dr. Charles Vance (Dr. Vance), a forensic psychiatrist called by the State to testify as an expert witness, was questioned by the State concerning his understanding of the terms "insanity" and "diminished capacity" from a psychiatric perspective. The following colloquy occurred:

> Q [The State] - Doctor Vance, would you be able to explain to the jury, as a – from a forensic clinician's standpoint the terms insanity *and* diminished capacity as they relate to your evaluation process?
>
> MR. CULLER [Defendant's attorney]: Well objection.
>
> THE COURT: I'm going to sustain that.
>
> Q Doctor, you used the *two terms* insanity and diminished capacity a few moments ago. Is that correct?
>
> A Yes, I did.
>
> Q What do you mean by those *terms*?
>
> MR. CULLER: Objection.
>
> THE COURT: That's sustained. Let me see counsel here just a minute.

(Conference at the bench.)

Q  Doctor, you mentioned the *term* diminished capacity; do you recall that?

A  Yes, I do.

Q  Could you explain as a -- from a forensic standpoint what *that term* means to you sir?

A    Yes.    Diminished capacity as -- diminished capacity as we assess it is an attempt to understand whether the person's mental health conditions or mental state may have been so wrought as to render that person unable to really think about their actions prior to undertaking them.  I -- I view the term diminished capacity as -- personally I feel it's a misleading term.

MR. CULLER:  Objection.

THE COURT:  Overruled; go ahead.  (Emphasis added).

It appears from the context that Defendant's initial two objections were to the form of the questions, not the content. The State posed the same question twice in compound form, and the trial court sustained Defendant's objections thereto.  The trial court then called the attorneys to the bench for a private conference.  Upon return, the State posed *the same question* with the only difference being that Dr. Vance was asked only about diminished capacity and was not asked about both diminished capacity and insanity.  Defendant did not object to this question, which was no longer compound.  Defendant's next objection followed Dr. Vance's statement that he viewed the term

diminished capacity to be misleading. Defendant's objection to this statement was overruled. Defendant did not give any basis for his objections.

Dr. Vance resumed his testimony with the following:

> Because it's suggested that if they are diminished in their ability to think about their actions, they might meet criteria. They might meet criteria for this -- for diminished capacity. But if you think about it, anybody who's had a drink, couple of drinks and might be a little bit tipsy, or anybody who's angry or scared is impaired to some degree in their ability to think about their actions. You know, people when they're mad, people when they're drunk, do stupid things. So I'm not looking for just that they're impaired in their ability; it's not just that it's diminished. When I assess this, I try to look for evidence that it's negated; this ability is completely negated, that they cannot think about their actions prior to undertaking them. And this is a state that's not perhaps unique to people with mental health diagnoses. I think anybody if in the right mental frame might be pushed to the point that they're not able to think about their actions. But mental health conditions, certainly significant mental health conditions might add fuel to that fire and might make it even more likely that a person might reach that stage.

Defendant did not object to any portion of this testimony, but now contends for the first time on appeal that the testimony should have been excluded because it contained a legally incorrect statement of what is required to prove diminished

capacity. Because Defendant failed to preserve this issue at trial, we do not reach the merits of Defendant's argument.

> "Generally speaking, the appellate courts of this state will not review a trial court's decision to admit evidence unless there has been a timely objection." To be timely, the objection "must be contemporaneous with the time such testimony is offered into evidence." "Moreover, [a] defendant los[es] his remaining opportunity for appellate review when he fail[s] to argue in the Court of Appeals that the trial court's admission of [the evidence] amounted to plain error."

*State v. Brent*,__ N.C. __, __, 743 S.E.2d 152, 154 (2013) (citations omitted). Because Defendant does not argue on appeal that any error in allowing Dr. Vance's testimony amounted to plain error, Defendant has abandoned plain error analysis as well. *Id*. This argument is dismissed.

## II.

In Defendant's second argument, he contends the trial court erred in denying Defendant's motion for a mistrial. We disagree.

Our Supreme Court has held:

> The trial court is required to declare a mistrial upon a defendant's motion "if there occurs during the trial . . . conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." It is well settled that a motion for a mistrial and the determination of whether defendant's case has been irreparably and substantially prejudiced is within the trial court's sound

discretion. The trial court's decision in this regard is to be afforded great deference since the trial court is in a far better position than an appellate court to determine whether the degree of influence on the jury was irreparable. Further, "[w]hen the trial court withdraws incompetent evidence and instructs the jury not to consider it, any prejudice is ordinarily cured."

*State v. King*, 343 N.C. 29, 44, 468 S.E.2d 232, 242 (1996) (citations omitted).

Defendant objected to a portion of the State's closing argument, and argues on appeal that "the prosecutor told the jury that Defendant . . . attempted to 'hightail it out the back door' in an effort to avoid arrest." The offending portion of the State's argument is italicized below:

> [MR. PHILLIPS (prosecutor)]: Wrongfulness; he closed the door behind him to hide the stabbing. He washed his clothes to get rid of the blood. He then tried to exit the back door in an effort to evade arrest. Taking together all these behaviors indicate he knew what he had done is wrong. Now, let me remind you of something. You heard that he was making a sandwich and watching TV. Now, what makes more sense, because that's what he said he was doing; and we know he exaggerates. Does that make more sense, or does it make sense you know it takes time to clean up. He did a pretty good job of cleaning up. He cleaned up this knife so good the SBI agent who testified had to get the DNA from underneath this clip right here. He washed his clothes, and then *he was getting ready to hightail it out the back door*, and did go out the back door –

MR. CULLER [Defendant's attorney]: Your Honor, may we approach?

THE COURT: No, keep your seat. Keep your seat. Ladies and gentlemen, you'll recall the evidence that has come before you. Again, as I've instructed you earlier to the extent that your recollection of the evidence differs from that of either of these -- any of these lawyers, you're to be guided exclusively by your recollection of the evidence. I caution you to stay within the record and the evidence as best you can.

MR. PHILLIPS: Thank you, Your Honor. So was he making a sandwich and watching TV, or was he covering up his crime and walking out the back door?

. . . .

MR. PHILLIPS: . . . . That's what he was doing right there. Diminished capacity; what does [an expert witness] say? Again, not so impaired as to disrupt his ability to form a plan and act to accomplish the plan. He had the specific intent of killing Ms. Simon by cutting her throat. All his behaviors were directed toward that goal. I view [that] Mr. Anderson had the ability to think ahead, plan, and act in a coherent and concerted effort to put that plan into effect. Well, we know what happened; he succeeded.

Following the State's closing argument, Defendant moved for a mistrial. Defendant argues that, by suggesting Defendant had "hightailed it" out the back door, the State improperly suggested facts not in evidence that suggested Defendant was acting to cover up his crime and escape capture, and was not laboring under any diminished capacity. Defendant argues there

were multiple videos from police cruiser dashboard cameras that show Defendant standing on his back porch smoking when the police arrived to arrest him, and that the State had seen those videos and knew Defendant had not attempted to flee. The jury never saw those videos because the trial court, as a sanction for a discovery rules violation, did not allow the State to use them at trial. Defendant does not include those videos as a part of the record, so we cannot verify their contents, but we assume, *arguendo*, that those videos show what Defendant contends.

Assuming the State was aware of evidence clearly establishing that Defendant did not attempt to flee, the "hightail it" comment was improper. Even if the evidence submitted at trial could have supported an inference of flight, the State may not make that argument if it knows that argument to be untrue. *State v. Smith*, 352 N.C. 531, 560, 532 S.E.2d 773, 791-92 (2000) (citations omitted) ("The trial court has a duty, upon objection, to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury."). If the videos showed that Defendant did not attempt to flee, the trial court should have censored the State's remark upon Defendant's objection. *Id*. However, assuming this error occurred, Defendant fails to show that the

trial court abused its discretion in denying Defendant's motion for a mistrial. "'[R]emarks are to be viewed in the context in which they are made and the overall factual circumstances to which they referred.'" *Id.* at 562, 532 S.E.2d at 792-93 (citations omitted).

When we view the offending remark in the context of the entire closing argument, and the evidence admitted at trial, we do not find that the remark resulted "in substantial and irreparable prejudice to [] [D]efendant's case." *King*, 343 N.C. at 44, 468 S.E.2d at 242 (citation omitted). Though the trial court did not censor the remark, *Id.*, it did instruct the jurors to rely on their own recollections of the evidence and not the arguments of the State. We find no abuse of discretion. *Id.*

No error.

Judges HUNTER, Robert C. and ELMORE concur.

Report per Rule 30(e).